Judgment rendered January 11, 2023.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 54,814-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

I-20 SELF STORAGE, LLC                          Plaintiff-Appellant

versus

BIG STUFF STORAGE, L.L.C.                       Defendant-Appellee

* * * * *

Appealed from the
Fourth Judicial District Court for the
Parish of Ouachita, Louisiana
Trial Court No. 19-2252

Honorable Daniel Ellender, Judge

* * * * *

HUDSON, POTTS & BERNSTEIN, LLP          Counsel for Appellant
By: G. Adam Cossey
    Jason R. Smith

NELSON, ZENTNER, SARTOR                   Counsel for Appellees,
& SNELLINGS                                Big Stuff Storage, LLC,
By: George M. Snellings, IV               & Jere C. Spence
    Allison M. Jarrell

* * * * *

Before PITMAN, STEPHENS, and MARCOTTE, JJ.

**PITMAN, J.**

Plaintiff I-20 Self Storage, LLC, appeals the judgment of the trial court dismissing its suit to rescind a sale of a self-storage property on the basis of fraud or error against Defendants, Big Stuff Storage, L.L.C., and its member, Jere Spence. For the following reasons, we affirm.

## FACTS

The following facts are gleaned from the record and the transcript of the trial held on November 29 and 30, 2021.

Plaintiff wanted an investment and observed Defendants' storage business, which was advertised for sale by DB Real Estate agent Deanna Norman. Spence had previously been a real estate agent with her agency. Plaintiff, through its Member/Manager Marlin S. Jones, made an appointment to tour the property.

Spence was present at the initial visit and provided Jones with an occupancy analysis report, a master list of all tenants and an email that he wrote stating that the miscellaneous expenses of the building included the cost of energy, a dumpster, property taxes, insurance and flood insurance. He informed Jones that there were 266 units total, of which 132 were vacant at that time, and that the actual rent generated per month, if all units were occupied, was $12,205.

Jones asked for records to verify the income, but the records and accounts for the property were combined with that of another storage business Spence owned and were not available. Spence stated that there were no traditional "books" for the business and that all documents were created from information contained in QuickStor, a software program for self-storage businesses.

Spence and Jones began negotiating a price for the property. Spence hoped to sell it for over $1 million. Norman requested the "rent rolls" from Spence to document the property's occupancy and monthly income, which she would then convey to Jones. Spence provided her with the information in April, July and October 2018, which was based on data he recorded in QuickStor. Spence informed Jones that the information he provided might not be accurate because he had allowed discounts on some of the units. He did not think the discounts were significant enough to disclose unless and until Plaintiff became a serious buyer.[1] Spence stated that the income generated was approximately $11,000 to $12,000 for the time period of October through December 2018.

In November 2018, Spence provided Jones with an updated occupancy analysis report that showed an increase in tenants after the rent roll provided five days earlier. This report increased the amount of incoming rent to $12,705 per month. After appraisals were conducted, Spence lowered his price to $910,000, and Plaintiff agreed to that contract.

Prior to closing, Jones learned that flood insurance would be more than $5,000 rather than the $1,800 that Spence had reported paying. This amount was greater because the insurance provided to Spence covered only the office of the property and none of the storage units. The bank financing the purchase required flood insurance on the entire property. Jones was going to renege on the sale, but Spence offered to lower the price to $870,000. Jones agreed to the purchase price reduction, and the sale of the

---

[1] Norman testified that she never had any reason to question the information Spence provided regarding whether the rent prices listed were accurate, whether the list included tenants from the other location or that it included tenants who were not actually paying their rent. She stated that had she known of inaccuracies, she would have had to disclose that information to Plaintiff.

property took place on January 7, 2019.  The document by which Plaintiff

obtained title is entitled "Sale of Property," and Defendants conveyed "the

following described property" found in Exhibit A attached to the document.

Exhibit A is a list of 12 lots, with their legal descriptions, situated at 711 N.

11th Street, West Monroe, Louisiana.

The act of sale of property also states that the sale is "As is, Where is"

and contains the following disclaimer language:

> **Vendor hereby disclaims any warranty, guaranty or representation, oral or written, past, present or future, of, as to, or concerning, (i) the nature and condition of the Property, including the suitability thereof for any and all activities and uses which Vendee may elect to conduct thereon**; (ii) the existence of any environmental hazards or conditions thereon (including the presence of asbestos) or compliance with all applicable laws, rules or regulations; and (iii) the compliance of the Property or its operations with any laws, ordinances or regulations of any governmental or other body. **The sale of the Property Is made on an "AS IS," "WHERE IS" basis, and Vendee expressly acknowledges that, except as to title to the Property, Vendor makes no warranty or representation express or implied, or arising by operation of law, including but not limited to any warranty of condition, habitability, merchantability or fitness for a particular purpose, in respect of the Property.**
> Vendee agrees that Vendor, except as to warranty of title, shall not be responsible or liable to Vendee for any construction defect, errors, omissions or on account of any other conditions affecting the Property, as Vendee is purchasing the Property AS IS, WHERE IS and WITH ALL DEFECTS AND VICES, WHETHER LATENT OR APPARENT, KNOWN OR UNKNOWN. Except as to the warranty of title, Vendee hereby fully releases Vendor, its employees, officers, directors, partners, representatives and agents from any and all claims that it may now have or hereafter acquire against Vendor, its employees, officers, directors, partners, representatives and agents for any cost, loss, liability, damage, expense, demand, action or cause of action arising from or related to any construction defects, errors, omissions, or other conditions affecting the Property.
> Vendee further acknowledges and agrees that this release shall be given full force and effect, according to each of its expressed terms and provisions, including, but not limited to, those relating to unknown and unsuspected claims, damages and causes of action. Vendee expressly waives the warranty of

3

fitness and warranty against redhibitory vices imposed by La. Civ. Code Ann. arts 2475, 2524 or any other applicable state or federal law. Vendee further waives any rights it may have in redhibition or to a reduction in or restitution of purchase price and revenues and/or costs pursuant to La. Civ. Code Ann. arts 2520 to 2548 inclusive, in connection with the purchase of the Property. Vendee expressly acknowledges such waivers and Vendee's express exercise of its rights to waive warranty pursuant to Louisiana Civil Code Article 2548. **Vendee acknowledges and declares that neither the Vendor nor any party, whomsoever, acting for (*sic*) purporting to act in any capacity whatsoever on behalf of Vendor has made any direct, indirect, explicit or implicit statement, representation or declaration whether by written or oral statement or otherwise, and upon which the Vendee has relied, concerning the existence or nonexistence of any quality, characteristic or condition of the property herein conveyed. Vendee has had full, complete and unlimited access to the property herein conveyed for all tests and inspections which Vendee, in Vendee's sole discretion, deems necessary for the protection of Vendee's interests. Vendee further acknowledges that the "AS IS WHERE IS" clause has been taken into consideration in the course of negotiating the price of the Property.** (Emphasis added.)

After Jones began operating the business, he became aware that the documents provided by Spence were not accurate reflections of the tenant occupancy rates or of the rent amounts. In the first month, total collections, including rents recorded before Jones took over, were only $2,863. Jones found that despite securing 28 new tenants since purchasing the property, the average rental income for the first six months was only $5,066.84, which was 60 percent lower than the rent revenue confirmed by Norman and Spence. Further, Jones discovered that some tenants were given a discount on their rent, and almost half of the tenants were not paying at all, even though Spence provided documents showing them as current, long-term tenants. Jones and his son attempted to contact these tenants and discovered that many of them listed as current on the rent roll had either moved out months or years prior to the sale or had never rented at all. They checked all

4

of the units and found that 65 of them, or 49.6 percent of the rent roll, were empty, even though they were listed on the rent roll as occupied units.

Jones also found in QuickStor that each time Norman requested an updated rent roll from Spence, he entered large numbers of "cash" payments, without corresponding deposits, for tenants who were not actually renting. In fact, the same day Jones asked for documentation of the $12,500 in claimed monthly rent, Spence made 41 entries for "cash" rental payments totaling $6,656 that were not actually received. None of these payments could be documented as actually having been paid or deposited.

Jones hired James E. Albritton, Jr., CPA, an independent appraiser, to conduct an informal audit of the business.[2] Albritton determined that the occupancy analysis report overstated the actual rent by $44,788 on an annualized basis. He also compared the time period of January 7, 2019, through June 30, 2019, to that of the same dates in 2018 and found that the rental income had been overstated by $93,369.92.

Once Jones discovered the discrepancies between the information provided by Spence and the actual occupancy and rental income per month generated by the storage business, he filed suit on behalf of his limited liability company against the seller Big Stuff Storage, L.L.C., but later amended to add Spence as a defendant. His petition references and attaches the occupancy analysis report, the master list of all tenants and other documents Spence prepared and provided to him during the negotiation process. He alleged that the fact that Spence provided him with a documented representation of the occupancy of the storage property

---

[2] Albritton did not testify at trial.

5

"unequivocally demonstrates that Spence understood the materiality of that fact-the number of tenants currently renting from the storage property." He also alleged that Spence understood that Jones intended to continue operating the storage property after his purchase and that he understood the materiality of the fact of the net income brought in by the property. He sought to rescind the sale of the property because of error or mistake of fact, or, in the alternative, nullity caused by intentional, fraudulent misrepresentation of fact.

Defendants responded by denying all allegations and stating that the sale of property was the best and only legal evidence of the contents. Further, Defendants denied any and all allegations that tended to "alter, limit, vary, modify or extend the terms and provisions of the document."

Defendants also pled as Plaintiffs in Reconvention and asked for damages for having to defend the "frivolous lawsuit," which required them to unnecessarily expend time, expenses and attorney fees. They claimed that the sale was made with an "As Is, Where Is" disclaimer and that the Plaintiff/Defendant in Reconvention was in bad faith in prosecuting the suit against them.

At trial, Plaintiff presented all the evidence of the circumstances leading up to the sale of the property, the negotiations, the documentation provided, his discoveries of discrepancies and the evidence of how he had been defrauded or misled prior to purchase of the property.

Spence testified that he and his wife bought the property for $750,000. In 2016, a flood damaged the property, and he received $123,000 from the insurance company for repairs. He also contributed $150,000 of his own money to the reclamation of the property. He built an office building and

6

two storage buildings. When he first listed the property for sale, the purchase price was over $1 million, which he thought was fair because the property appraised for $1.16 million in June 2017.

Defendants' attorney asked Spence to explain the differences between the three rent rolls and the amount of rent each claimed to be garnering. Spence stated that the roll that claimed $12,000 showed "potential rent in a perfect world if everyone came in on the 1st and paid, which rarely happens in rental property[.]" Spence also testified that he had noted certain property that should have been removed from the list and that would have resulted in a reduction of rent. He stated that he had no reason to dispute what the numbers were and that Jones had not asked for rent rolls for eight months out of the year. He testified that the business of storage rental was volatile and that rent fluctuated from month to month. He denied that he ever tried to inflate the rent rolls and claimed that Jones never asked about individual tenants or their payment rates. He further explained that his computer system had been down due to the flood and as a result of the post-flood construction. He was working on bringing his data up-to-date, and there was no intent to defraud.

Spence also stated he never guaranteed orally or in writing that the rent rolls would bring in around $11,000 - $12,000 per month; however, he also testified that $11-12,000 per month would be with 50 percent occupancy. He testified that prior to the flood, the property was 92 percent occupied and that it produced up to $20,000 per month. Further, he testified that he never did anything improper or deceitful and never misrepresented anything in any way.

After the bench trial, the trial court took the case under advisement and issued an oral ruling and reasons for judgment in open court on December 16, 2021, denying and dismissing all of Plaintiff's claims against Defendants.

The trial court's oral reasons for judgment state that the main issue to be decided was whether Defendants intentionally misrepresented a factual component of this sale significant enough to deter Plaintiff from completing the sale. It reviewed the evidence presented at trial in detail and found that Plaintiff proved that the rent rolls overstated the rent rates actually being charged, that they included tenants who were not actually paying and that half of the tenants listed were not actually renting when Plaintiff purchased the property. It concluded, however, that this could have been the result of sloppy bookkeeping or negligence rather than a purposeful intent to deceive. It further found both Plaintiff and Defendants to be credible. It stated that Defendants did not intentionally misrepresent something with the intent to obtain an unjust advantage over Plaintiff.

The trial court further found that Plaintiff acquired the property for significantly less than the appraised value, and there was no representation in the purchase agreement or in the cash deed that there was any guarantee as to the longevity of any of the renters. Although it did find that there was sufficient information to cause Plaintiff to be concerned and suspicious, it did not find evidence of fraud. On that basis, it denied the fraud claim. It did not issue any specific findings or rulings on the claim for rescission due to error, although it did dismiss all of Plaintiff's claims against Defendants.

The trial court also denied and dismissed all of Defendants' claims as Plaintiffs in Reconvention for damages due to the filing of a frivolous

lawsuit, stating that Plaintiff's good-faith belief that the law and evidence supported its claim resulted in a dismissal of the claim. It required all parties to pay their own costs and attorney fees.

Plaintiff appeals.

## DISCUSSION

*Fraud*

Plaintiff argues that it was manifestly erroneous for the trial court to find it had not proven fraud as a cause for rescission of the contract of sale. It asserts that it provided proof the rent rolls grossly overstated the rental rates for more than 30 percent of the tenants. It contends that Spence's intentional acts of entering non-existent cash payments when the rent rolls were processed made it appear that rent would still be collected even when the tenants did not exist. It argues that it showed through tax returns and financial records that Spence's claims of profitability were false and that the business was losing hundreds of thousands of dollars up until the day of closing. It asserts that although a trial court has discretion in determination of the facts, it must have some evidence upon which to base its ruling; and, in this case, it does not.

Plaintiff points out that the trial court's reasons for judgment cited the fact that the sale was part of an ongoing transaction and that the property was purchased for "significantly less than the appraised value." However, it argues that the reliance on appraised value is logically flawed and manifestly erroneous because the appraisal was based on the same false information it had been provided, and the appraisal is irrelevant to the fraud perpetrated upon it by Defendants. It contends that if a party agrees to purchase based on false information, the requisite consent is vitiated.

9

Defendants answer, claiming that the self-storage business has a great amount of variability because tenants sign a month-to-month contract and can leave at any time. Rent fluctuates month to month and is volatile. Some tenants pay a few months in advance, while some may not pay at all.

Defendants argue that Plaintiff had plenty of time to investigate the business. They allege that the property was sold "as is," and Plaintiff bought exactly what he saw — the physical property. There was never a warranty of future collections or revenues, nor were there guarantees that the rent rolls Spence presented to Plaintiff indicated what Plaintiff could expect in the future. They contend that they never told anyone that the property would bring in $11,000 to $12,000 per month after closing. Plaintiff's appraisal, which was performed prior to closing, showed that the effective gross income was below the amount shown on the rent rolls, but Plaintiff purchased the property anyway.

Defendants further argue that Plaintiff did not meet its burden of proof that they committed fraud or misrepresented information in an effort to gain an unjust advantage over it. They contend that the trial court made a reasonable evaluation of credibility and inference of the facts. They argue this court is precluded from setting aside the trial court's finding unless it is clearly wrong in light of the record reviewed in its entirety.

La. C.C. art. 1953 defines fraud as a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. The elements of a fraud claim are (1) a misrepresentation, suppression or omission of true information; (2) the intent to obtain some unjust advantage or to cause some damage or inconvenience to another; and (3) the error

10

induced by the fraudulent act must relate to a circumstance substantially influencing the victim's consent. *Aymond v. Citizens Progressive Bank*, 52,623 (La. App. 2 Cir. 6/26/19), 277 So. 3d 477, *writ denied*, 19-1200 (La. 10/15/19), 280 So. 3d 602.

Fraud does not vitiate consent when the party against whom the fraud was directed could have ascertained the truth without difficulty, inconvenience, or special skill. La. C.C. art. 1954. However, this exception is not applicable when a relation of confidence has reasonably induced a party to rely on the other's assertions or representations. *Id.*

The trial court's findings with respect to a claim of fraud are subject to the manifest error standard of review. *Clay v. Washington*, 51,065 (La. App. 2 Cir. 1/11/17), 211 So. 3d 1266. To reverse a fact finder's determination, the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong. *Stobart v. State Dep't of Transp. & Dev.*, 617 So. 2d 880 (La. 1993).

When there is a conflict in testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on review. *Rosell v. ESCO*, 549 So. 2d 840 (La. 1989). The fact finder's choice between two conflicting, but permissible, views of the evidence cannot be manifestly erroneous. *Stobart*, *supra*.

While a cause of action for intentional fraudulent misrepresentation as to past or present facts exists in Louisiana, an action for fraud cannot be predicated on unfulfilled promises or statements as to future events. *Watermeier v. Mansueto*, 562 So. 2d 920 (La. App. 5 Cir. 1990). In *Mansueto*, the Watermeiers bought a wine business from Mansueto after

11

only receiving documents estimating the viability of the business and that bore no warranty or guarantee of correctness. They did not hire any accountants or other consultants to verify the information the seller provided. The document was entitled, "Approximate Analysis and Pro Forma Study, Wine Cellar Liquor Store."

Based on the documentation they had been provided, and without doing any further investigation, the Watermeiers bought The Wine Cellar. The business did well the first month, but profits steadily declined. Eventually the Watermeiers went out of business, had to sell or donate their inventory, and sued the seller and a real estate agent. They alleged they had been fraudulently induced to buy the business by the false figures furnished by the Mansuetos. They sought recovery of the purchase price of the business, damages for loss of income and mental suffering, and recovery of expenses, including attorney fees and interest.

The trial court rendered judgment in favor of Mansueto, found that he was not the cause-in-fact of the Watermeiers' losses and dismissed their suit. It found that the statements given to the Watermeiers were simply estimates and that there were no warranties or guarantees. It also found that other financial data was available for their analysis of whether they were making a wise and realistic investment.

The appellate court noted that a finding of fraud is only a threshold matter, and the central issue was whether the fraud on Mansueto's part was the cause of the Watermeiers' financial losses. The court affirmed the judgment of the trial court and found that although the seller took advantage of the buyers' naivete, they failed to investigate fully and failed even to perceive obvious omissions in the information provided to them.

12

Although the *Mansueto* case is instructive on the issue of the application of fraud and La. C.C. arts. 1953 and 1954, it can be distinguished from the instant case in that the plaintiffs in *Mansueto* were buying a business as well as a premises; in the case at bar, the act of sale, and all negotiations, concerned only the sale of the physical property described in Exhibit A. Although Jones asked for certain financial information at Spence's disposal and intended to use the property as a storage property, the "Sale of Property" document specifically states that the sale is made on an "as is, where is" basis. The same paragraph states that, except as to title to the property, Spence makes "no warranty or representation express or implied," including, but not limited to, any warranty of condition, habitability, merchantability or fitness for a particular purpose, in respect of the property. The sale did not include any language to indicate that Plaintiff was buying the business of Big Stuff Storage, L.L.C., and it made no guarantees that the storage property would generate a specific amount of money for the buyer.

During the ongoing negotiations between the parties, Spence provided information requested of him; and even though the figures presented might have been maximized or estimates, the trial court found no fraudulent intent and found the discrepancies to be a result of sloppy bookkeeping. Jones did not investigate further when he could have done so during the negotiations, and Spence continued to lower the price of the property until Jones was satisfied with the price and signed the document conveying the property to him with all of the disclaimers of warranty contained therein.

13

Because a reasonable factual basis exists for the finding of the trial court and that finding is not clearly wrong, there was no fraud and there is no manifest error in the judgment of the trial court.

This assignment of error is without merit.

*Rescission*

Although the trial court dismissed without reasons all of Plaintiff's claims against Defendants, Plaintiff claims it was error for the court to dismiss its claim for rescission of the contract based on error of cause. It argues that a de novo review of the record is necessary to address this error of omission by the trial court.

Defendants argue that when the trial court made credibility determinations and findings of fact related to the fraud issue, the rescission issue was subsumed into those findings by the court. For that reason, the dismissal of all claims by the trial court could be based on the same set of facts and evidence presented earlier at trial.

La. C.C. art. 1949 states that error vitiates consent only when it concerns a cause without which the obligation would not have been incurred and that cause was known or should have been known to the other party.

Error which vitiates consent can manifest itself in two ways: mutually, i.e., both parties are mistaken, or unilaterally, i.e., only one party is mistaken. *Peironnet v. Matador Res. Co.*, 12-2292 (La. 6/28/13), 144 So. 3d 791. However, in both situations, the error for which relief may be granted (1) must affect the cause of the obligation, and (2) the other party must know or should have known "the matter affected by error was the cause of the obligation for the party in error; that is, that it was the reason he consented to

14

bind himself." *Id. See* La. C.C. art. 1949, Revision Comments-1984, cmts. (b) & (c) (West 2012).

Error may concern a cause when it bears on the nature of the contract, or the thing that is the contractual object or a substantial quality of that thing, or the person or the qualities of the other party, or the law, or any other circumstance that the parties regarded, or should in good faith have regarded, as a cause of the obligation. La. C.C. art. 1950.

It is not the province of the court to alter by construction or to make new contracts for the parties. *Peironnet*, *supra*. The duty of the court is confined to the interpretation of the agreements the parties have made for themselves, and, in the absence of any ground for denying enforcement, to give effect to the agreements as made. *Peironnet*, *citing Texas Co. v. State Mineral Bd.,* 216 La. 742, 751, 44 So. 2d 841 (La.1950).

In the case at bar, Plaintiff argues it was induced to enter into the contract of sale of the property because Defendants led it to believe that it could successfully operate the storage unit property profitably. Plaintiff, seeking rescission of the contract on the basis of error of cause, had to prove that the error bore on the nature of the contract or the thing that is the contractual object or a substantial quality of that thing. It was unable to prove it is entitled to rescission of the sale of the property. The property was advertised as the sale of physical property, comprising several lots, all located in a certain place. Defendants did not advertise that they were selling the name or business but, instead, were selling only the property. The document by which the property was conveyed contained the legal description of the property and many statements limiting the warranties

15

provided, including that the seller made no warranty of the property for fitness for any particular purpose.

The unilateral error made by Plaintiff was one that could have been easily determined by due diligence prior to the sale. Plaintiff saw the property, negotiated for a very long time, was granted concessions in regard to the price of the property and signed the contract by which the property was conveyed to it. It was only after the sale was complete that Plaintiff discovered it was not reasonable to rely on Defendants' documents. Defendants did not induce Plaintiff to buy the property through fraud, but by lowering the price to an amount it deemed fair. Plaintiff sought to buy the property with storage units already in place, and that is what it was sold. There was no error in the cause of the contract, and the trial court did not err when it dismissed all of Plaintiff's claims.

This assignment of error is without merit.

## CONCLUSION

The judgment of the trial court in favor of Defendants, Big Stuff Storage, L.L.C., and Jere Spence, and against Plaintiff, I-20 Self Storage, LLC, is affirmed. Costs of this appeal are assessed to I-20 Self Storage, LLC.

**AFFIRMED**.

16